Good morning, everyone. Good morning, Your Honor. Mr. Bryan, can you hear me all right? I can hear you fine, Judge. Thank you. Okay, thank you, and thank you for allowing us to impose upon you. I know it's not the most convenient situation for you, but it was a case where we wanted to have the benefit of counsel and the give and take that goes with oral arguments, so we thought this was better than foregoing the oral argument. I appreciate the courts accommodating me with respect to my injury, and I just hope that you don't think my leg injury means I don't have a leg to stand on. You've got one left, I assume. I have one left and two crutches in case I have a problem. I only need a cane. What's that? I only need a cane. Just a cane, okay. These Jersey people are a little tougher, I guess. Oh, we're a lot tougher. Mr. Merkley, can you hear and see everything all right? Yes. Okay, can I pronounce your name correctly? It's Merichley, Your Honor. Okay, so the answer was no, I believe. Okay, Mr. O'Brien, why don't you go ahead. Thank you, Your Honor. As the Court knows, my name is Timothy O'Brien. I represent the appellant, James Baranowski. It is our position in this case that the record contrary to the lower court's conclusion does not establish as a matter of law that Mr. Baranowski's speech was a part of his regular duties. And it is our contention that the Court, in reaching that conclusion, improperly resolved factual disputes, did not give Mr. Baranowski the benefits of viewing the facts most favorable to him or drawing the inferences most favorably to him. What do we do with paragraph 7 of your complaint? Yes. Will you say that subsequent to the shooting of the minor, in his capacity as incident commander and also as use-of-force expert, complained to supervisors concerning the handling of the investigations into the shooting. Now, clearly it's before Garcetti, and you kind of got sad-bagged when Garcetti came down, but the complaint is there. Yes, the complaint is there, Judge, and we made it very clear on the record, and Mr. Baranowski testified that that particular allegation, there were two complaints that he made. The first complaint was, as the incident commander, that appropriate personnel did not appear when they should have, that supervisory personnel did not stay on the scene, and he did complain about that. And that speech, we agree, was part of his duties. If you look at paragraph 9, there's a separate allegation that he then complained later in February about his belief that there was a cover-up. His belief that there was a cover-up came about subsequent to the performance of his duties as the, what's really the first responding officer. So we did distinguish that, and I would note for the court, and I think it's very clear. You're not suggesting, are you, Mr. O'Brien, that when he ceased being an incident commander, let's assume for argument that that was when he filed his report, that he ceased also being a use-of-force expert? I don't think that he ceased being a use-of-force expert, but I would note this for the record, and I think it is clear from the record. The Pennsylvania State Police never recognized him as a use-of-force expert. Mr. Baranowski, outside of his employment with the Pennsylvania State Police, held himself out as a use-of-force expert, and it was secondary employment. So he had no role whatsoever in his capacity as a state police officer to determine whether use-of-force was appropriate or not. The only time he did that was outside the confines of the Pennsylvania State Police. So that was the only time that he was an expert in that regard. I would also note... Forget his expertise for a second. Let's assume this is just a police officer who has obviously some familiarity with the use of deadly force. Officers have to be given some instruction on the limitations of deadly force. And just based upon his expertise as a police officer and his professional training, he made the same conclusion and made the same observation and the same statements. Why wouldn't that be pursuant to his role as a state trooper? Well, two things about that, Judge, if I may. Every single police officer is trained on the use of force. So if that were the standard about whether a police officer could complain about inappropriate use of excessive force, then no police officer would ever be protected under the First Amendment. And this goes to the heart of Garcetti. But that puts it in the hat because the issue in a sense is whether or not any police officer after Garcetti is protected under the First Amendment, maybe under whistleblower statute or something else. Right, and that's what I'm getting to, Judge. I think that if you read Garcetti, if you read this court's decision in Foraker, and, of course, the court is very familiar with that, it's very clear that what the court enunciated as a standard was what are this particular employee's job duties every day. The court was very emphatic in Garcetti that it was the fact that Sabella had to write that memo as part of his duties. And here's where we get into this question of fact. What the court in Garcetti said was look at the actual expectations. If you look at the expectations in this case based on the facts, there's a clear dispute, if not a conclusive factual conclusion, that the state police did not expect Sergeant Baranowski to voice his concerns. Well, I don't know if that is a realistic assessment. Garcetti says you have to view the duties practically. They use the word practical a couple times in the opinion. Baranowski was probably the person who knew exactly what transpired or was alleged to have transpired because he was the incident commander. He prepared the report and submitted the report and then came to believe that there was something there that wasn't right. So wouldn't he have been expected to say something about it? There's no one who had more knowledge of what went on in the scene than the man who... Actually, Judge, his role as the incident commander, according to their own expert, and if you would look at page 1413 in the record, they had Lieutenant Jobe testify in the Higginbottom case. This was his role, Baranowski, pretty much get everything into a contained and isolated situation and make appropriate contacts, including to command personnel to determine further who is going to conduct the investigation. The point here, Judge, is that there were particular people assigned to make the determination about what happened. It was not Baranowski. Judge, I think... He saw the scene. He saw where the shell casings were. He came to hear the stories. He saw where the body was. He saw Curry. He saw all of this. So he certainly had knowledge. And, Judge, I think under Garcetti, the court had two caveats. It said, one, the fact that the memo concerned subject matter of Sabello's employment is not dispositive. Now, if that has any meaning, then it must mean that because you have knowledge as a result of your employment, that fact is not dispositive as to the inquiry. And I would point the court to this, and I think this is important. Counsel for defendants, on the record, and this is at page 1549 and 1550, said in response to whether or not Baranowski was making these statements as the incident commander, this is what he said. I don't believe we ever said he was the person in our briefing or argument who was responsible for making the final determination of whether or not the shooting of Michael Ellaby was defensible or to characterize it in any particular manner. That's on page 1549. At 1550, he says, whether or not the shooting of that, the tragic question, accidental shooting of that boy was a good shot, whether it was or wasn't within the scope of his duties, we never said it was. Now, how can that not create a factual dispute? And I would point out to the court, this case is unique in that we have direct evidence from the other side saying that the speech was not part of his duties. It was none of his business. In Deluzio v. Monroe, which is an unreported decision, this court ---- If someone says, as Jeff supposedly said, mind your own business, that constitutionalizes the statement that had previously been made? No, it doesn't constitutionalize it, Judge. What it does is it creates an issue of fact as to whether or not the statement that was made, the allegedly protected statement, was done in accordance with the employee's assigned duties. In Deluzio, this is what the court said. Deluzio's speech was protected by the First Amendment. Deluzio did not have professional responsibility or official duties over any of the topics covered in his memo. His supervisor's problems with Deluzio stem precisely from his frequent and unwelcome comments on matters that the supervisors felt were not within Deluzio's purview. Here we have repeated statements by Depp and Waters that Baranowski should have nothing to do with the investigation, that they didn't care what he said, that what he said was baloney and none of his business. In Riley v. City of ---- It's kind of misleading. The issue is difficult, as you guys said, anyhow. But this is obviously, what's lurking underneath here is the court of silence issue. And I think you're relying upon the informal court of silence to argue that it wasn't really part of his duties because he was told, quote, mind your own business, butt out, go away. But is that the kind of thing in terms of public policy that we would want to say exclusive from the realm of his official job duties? He may have been acting in the very best tradition as a police officer by not doing that and by refusing to mind his own business, upholding the best tradition of the state police force. Here's the point about that. What that does is raises this question of fact. We cited several cases in our brief, in the reply brief, including the Ninth Circuit decision in I can't think of the name right now, but also the Paolo case. I'm sorry? Posey, I believe it is. Well, Posey is the one case, and then there's a case subsequent to that, and I'll have it on my rebuttal judge, the name of it. But in any event, in that case and also a district court case from the Second Circuit, both said where there's an assertion of a cover-up, then it becomes a factual matter as to whether or not the speech was expected. In the context of a cover-up, in the code of silence, there is no expectation of speech. And the point here is that there is evidence of record to support that. Here is Mr. Aronofsky going first to Depp, who tells him none of his business. That supports the notion that, hey, stay out of this. We don't want to rock the boat. Then he goes to Waters after he's told it's none of his business, and Waters says, I don't care. I don't want to hear that from you. Neither one of them, if there wasn't a code of silence, if there wasn't a cover-up, and this was part of his normal responsibilities, why wouldn't they have reported that up the chain of command? If he's a sergeant and he's standing there in front of his supervisors and says, hey, there's a cover-up here. I was there. I've got some additional information from the coroner's inquest. This wasn't exclusively based on the scene. And now I'm thinking about this, and you know what? We have a problem here. There's a cover-up. They're lying. And his fears turned out to be true. Well, he went up his chain of command. He went to his two supervisors. Right. So you're saying he should have gone further? He should have gone to the superintendent or he should have gone to the next level? No, what I'm saying, Judge, is that there's evidence in the record to support that there was a code of silence. If there's a code of silence, there's no expectation for somebody to come forward and disclose facts. The evidence that supports that, in addition to the direct evidence that we have, is the fact that these two supervisors, I'm talking about them, never went any further with it either. They didn't tell him, hey, gee whiz, fill out a report. They didn't treat it as if it was part of his responsibilities. And what I'm saying is, and I think it's critical, that these underlying facts just cannot be assumed. There are facts that contradict the conclusion that this speech was part of his duties. And I would note on this supervisor issue. Suppose another trooper. Our city did not overrule Kevin. Hold on a second. I just asked a question. Suppose another trooper overheard somebody who was not involved in this at all, heard the two officers that were involved in a private conversation, and overheard them making an inculpatory, you know, comments about what had happened at the day of the shooting. And he reported them to his supervisor and said, you know, you want to know something. There's a con going on here. Would that be part of his responsibility? Judge, good question. Every police department has a general rule that requires a police officer to report wrongdoing. And I think the question that is posed by these general rules is, as a factual matter, was the general rule enforced and applicable as to the speech involved? So if you take your situation and the police officer writes out a report and gives it to the supervisor and the supervisor handles it as if it were a report in the normal performance of duties and it goes up the chain of command and they investigate it, then I think there would be factual predicate to say that that general rule, putting aside what the officer's actual responsibilities on a daily basis were, could be in effect at that time. Compare that to our situation. Here we have a general rule. Baranowski goes to his supervisor, his immediate supervisor. The immediate supervisor says, none of your business. Forget it. It's not your investigation. He goes to his next in command. Polony, I don't care what you have to say. The investigation is over. So as a practical matter, and that's what Garcetti asked you to do, make a practical analysis, you have to do it on a case-by-case basis. If you're involved in a police department that is engaged in a cover-up, if there's a code of silence that's being enforced, if your complaints are not responded to, then I think as a factual matter you can conclude that that general rule, in that particular case, was not operative. And consequently, it did not, there was no, as Garcetti says, no expectation. And what Garcetti asks the court to do is to make the question or answer the question of the proper inquiry is practical. What duties is an employee expected to perform? And I think that's a factual question. There's not a single case, Judge, Your Honor, there's not a single case that they could cite, that I could find, that says that the scope of an employee's duties is anything other than a factual matter for the finding, for the prior fact to be defined. You want a new man for trial here, and hopefully, of course, from your point of view, part of the trial will include damages. But what's the liability question that the judge is going to put to the jury? In other words, if there's a remand for trial, then there has to be some dispute that the jury's going to have to resolve. And what would the judge instruct the jury that it has to determine? Well, there are a number of subsidiary factors here. For example, the judge concluded that the speech in question was part of his duties as the incident commander, that they were within the scope of that. I think that's a factual question that the jury could answer based upon the facts in the case. The jury can answer the question of whether or not the general rule was operative in this particular instance. I think in our reply brief, we listed some other subsidiary factors. Well, what about your client's admission in paragraph 7 of the complaint? Right. It would come in, and if I may address that just for one moment, that admission has been explained, and I think it is clear that it's not controlling here. But I would also note that in the context of this case, the defendants have denied in the Hickenbottom case and by statements of counsel that his speech that's at issue was part of his duties as the incident commander. So this is a unique case in that while we have alleged that, and I think we've explained what was involved in that, nevertheless, the defendants have denied in this case explicitly on at least six occasions that the speech was part of his duties as incident commander. And the reason they did that is because in Hickenbottom, he was killing them. So they brought an expert in and said, hey, you know, he didn't have those responsibilities in the incident commander. Now they want to come into this court and say, oh, yeah, it was all the incident commander. But you're not arguing judicial estoppel, though. I don't see that anywhere in any of the briefs. I didn't say there's judicial estoppel, Judge, although there may be. I'm satisfied with there's a dispute in the facts that allows me to go to a jury on this. If you're right about it, and that's the heart of this, whether it's a question of law or a question of fact, if it's a question of fact, and that is let's have a scenario where we say that the underlying statements are all stipulated to or agreed to, there's no issue about that. The only issue is whether or not those statements are part of the job duties. You seem to be arguing that's a question of fact. If you're right, then there's no qualified immunity anymore. How could it be that it's a question of fact? Because you never, ever get qualified immunity. You always have an issue of fact lurking under the case, and the case then turns on a factual issue. It's got to be a question of law, hasn't it? You don't always have a question of fact. In Garcetti, the parties that the memo was pursuant to his official duties. No question about it. That was conceded, though. That was not an issue and dispute in that case. I know, but in Foray. That's a big difference. It is a big difference, but I think there could be. For example, in this case, if in the initial complaints that Mr. Baranowski made about the fact that So that would not be a disputed fact. But to the heart of your question, Judge, there are innumerable instances where qualified immunity depends upon the jury making factual determinations. It happens in probable cause issues all the time. There are a myriad of constitutional questions where there's a right to qualified immunity, but before it can be determined, a factual decision where there's a conflict has to be made by the jury. This case would be no different, and why should we treat it any different? Well, there is a conflict, but the way you're arguing question of fact, it seems to me you always have it, because you have certain things that the person clearly, and you're always going to have this in these cases. The person has to do, or the person did his normal course, let's say, A, B, C, D, E. Was the statement pursuant to his job duties, knowing that he normally does A, B, C, D, and E, because the job duty is never going to include speech or making a statement, unless it's a press officer of some kind. So you always have the issue, unlike the Fourth Amendment probable cause context, where underlying preliminary facts get elevated to making the legal determination, because someone has to determine whether or not these things that the person had to do, the statement was made pursuant to those things or not pursuant to those things, to determine whether or not it was a statement pursuant to a job duty. If that's a question of fact, then it seems to me there is no qualified immunity in Garcetti kinds of cases, unless some employer stipulates that statement was pursuant to his job duties, and that's never going to happen. Although I think, Judge, I think that there are, and there are certainly enough Circuit Court cases that would attest to this, that there may be admitted facts that, as a matter of law, are dispositive of the issue, and that certainly would evolve as the case law develops. But I don't think it changes the conclusion that certain issues are appropriately factual questions. The court in Forex said, unlike the question of what speech is protected, whether it's protected or not, by the First Amendment, the question of whether a particular incident of speech is made with any particular plaintiff's job duties is a mixed question of fact and law. And the question I would ask the court is, what facts, who gets to decide those facts? If it's a question of fact, my understanding is a jury gets to decide that. In Bose, the Supreme Court said if it's something that you can decide based upon practical, logical common sense, it goes to the jury. Again, every single case we studied in our briefs of the scope of a person's employment have all found, in every context, that it's a factual question. I have a question that's a little different. To me, the whole law seems, in the First Amendment context, somewhat counterintuitive, that you don't have protection under the First Amendment if this is part of your duties. You can come in, and it's part of your duties to report something. The guy says, thanks for reporting it. You're fired. Well, that's not a First Amendment case. But we wondered, or at least I wondered, why, in this particular case, you tried to shove it under the First Amendment because there are other statutes that might have been better, even common law theories like the whistleblowing statute and so forth. Right. Well, let me just say, Judge, when this law was filed, the prevailing law in this circuit was that this was a quintessential First Amendment case. We didn't try to shove it anywhere. It was a Pickering case. It was a Pickering case. The Pickering case, this Court's decision in the Baldessari v. State of New Jersey, I mean, you couldn't read a single case and not conclude that this was a quintessential First Amendment. But I would point out this- Why didn't you do also state law claims? Well, the state law statute in this case is six months. And this case was not before me at that time. So we were past the statute of limitations in any event. But note this for the Court. There has never, ever been a decision by any court that your constitutional rights depend upon the existence or non-existence of a state law. If that were the rule, then the states would control our constitutional rights, and that is an absurd position. That wasn't the point of the question. I understood that. I never thought that it was. But I just wondered why you seemed to take a harder course, that's all. But you gave a good explanation. You didn't have any choice. The statute of limitations barred you. That's true. But at the time, Judge, it wasn't a harder course. The First Amendment was a clear avenue of remedy in this case, and Garcetti certainly changed the law, although I don't think Garcetti has changed the law as broadly as many courts have interpreted. Courts have clearly ignored the two caveats that Garcetti was explicit about. And those caveats were that if it's subject matter, that's not dispositive. If it's within the confines of the four walls of your place of business, that's not dispositive. I'm not sure courts have ignored it so much as courts have tried to figure out what the Supreme Court was saying, because it seemed to go out of the way to say that there weren't overruling Pickering, but within which Pickering can operate after Garcetti, it's quantum in measure. It is really minuscule. I guess I could say to a law clerk, I didn't like your memo because I don't like your attitude. You're fired. I suppose that was in his duties to write a memo. That's correct. And by the way, Judge, in that context, your law clerk would have no protections whatsoever because that doesn't fall within the whistleblower act. So unfortunately, you would lose out. If I may, it depends on what was in the memo. If I fired every law clerk I disagreed with, I'd be alone all year. I would point out to the court, if I could, in Riley v. City of Atlantic City, there was a similar issue. There were two issues in Riley. One had to do about testifying in court, but there was also another factual issue. And the court said, Riley argues that the question whether he engaged in speech pursuant to his official duties presents a factual issue that is not cognizable under the collateral order doctrine. We agree that some aspects of Riley's speech in the context of the Monmouth investigation require further factual development. And then, in support of that, they noted this transcript where there was a discussion about the plaintiff's duties. And the defendant said that when the plaintiff was talking to the defendant, the defendant said back to him. And what I received back from him was the only thing he was concerned about was it wasn't our job to do it. You shouldn't have been involved, you know. And then this is what the Third Circuit said. This passage suggests that Flipping, the defendant, disagreed with Riley as to whether Riley's actions were in fact part of his official responsibilities. So this court twice, in Delugio and in Riley, recognized that when the decision-maker makes a direct statement contradicting that the duties are part of the employee's responsibilities, that creates the factual dispute that goes to the jury. Thank you. Did you save time for rebuttal? Three minutes, Your Honor. I think I may have used enough. I couldn't see the red light. It would appear that we couldn't either because it went off about 15 minutes ago. Good morning, Your Honor. I please the Court. My name is Kamal Alexander Marichli. I represent the appellees in the present case. The simple fact at the heart of this dispute and which has engendered what I would suggest is considerable ingenuity on the part of my learned opponent is the fact that Garcetti did, in fact, work a sea change in the law. Before Garcetti, as interpreted by your Court's decision ably in the Baldessari case, all Mr. O'Brien would have needed to place this case on a constitutional footing he had in the sense that no one denies that Mr. Baranowski's statements were on a matter of public concern. The difficulty is Garcetti went back to the roots and the wellspring in Pickering and read the statement previously considered to be surplusage that the statements at issue have to be made in the capacity as a citizen as, in fact, a term of art and part of the analysis necessary to determine whether and if there's a constitutional issue. And they did it while saying that the entire Pickering balance was still in place. Yes. I don't know where it is, but it's sitting there somewhere. It's, as you say, at levels measured only by quantum measurements at this point. But that is, in fact, the predicament that he's in, and it's a predicament created for him by a decision of the United States Supreme Court. And he lays great strength on the fact that I've consistently made the point that my clients have never said, either in the hick and bottom testimony from our expert or through me or in any other way, that Mr. Baranowski was the officer in charge of determining whether or not the Ellerbee shooting was a good shoot. That's a red herring, though. Of course, I've admitted that. But by admitting that, I am, in fact, begging the question of whether or not his statements that he made were in his capacity, his official capacity, specifically as the instant commander on the scene, and generally as a Pennsylvania State Trooper subject to the field regulations. And of course they were. Even though he had no responsibility for making the ultimate determination, he was the man on the scene. And those related, as Judge Fischer notes in her opinion, to the accuracy of his observations, the way he did his job as the incident commander, the ultimate homicide report he wrote as an that the Pennsylvania State Police Internal Affairs Department, called at the time the Bureau of Professional Responsibility, subsequent to his statements at issue in this case to Depp and Waters, in fact interviewed him about what he saw at the scene and what his views were. I think Mr. O'Brien relies most heavily on Depp's statement to mind your own business, go away. This is not your investigation. And how can we ignore that? Given the practical lens to which we're supposed to focus our inquiry, how do we ignore that? If on paper he's supposed to do one thing, according to the field manual and as a Pennsylvania State Trooper, but in reality everybody who's an employee, a uniformed employee of the State Police, understands there's certain things your job includes and certain things it doesn't include. One of the things it does not include is to dim out a fellow officer. Given the practical lens, why shouldn't we then, and clearly if Pickering does exist at all, you can't get a statement which touches any more on a matter of public import than the legitimacy of force that is used by those sworn to uphold the law. Why wouldn't this be one of those very, very narrow areas where perhaps Garcetti did not totally displace these kinds of statements? First, let me emphasize that I think Depp's statement is a red herring. It doesn't matter what Depp said. It matters what Baranowski said in connection with his, what is expected from him as a State Trooper and as an incident commander. But isn't Depp's statement exactly going to that? What is expected of Baranowski in the practical sense? It's Depp's statement really that gives rise to the expectations, not what's in the field manual. First, let me emphasize that Depp's statement was made after Baranowski made his statement. So as Judge Fischer interprets it... Wait a minute, wait a minute. The Depp statement was made after Baranowski spoke to the FBI, right? Right, but it had nothing to do with... And asked him about that. Yes, you're right. Everything you said, Your Honor, is correct. And then, if I may, Your Honor, then Baranowski made his statements. He alleges that Depp said, mind your own business. But you know what I wondered about that? Is it really, at that point, a determination of what Depp says that Baranowski's duties are? He doesn't use that term, I understand that. But in effect, or is it a question of what, in fact, his duties are based on what the State Police do? In other words, can Depp define the scope of Baranowski's duties? Because he might be saying, just keep your mouth shut, even though people say that. Just keep your mouth shut, even though it is within your duties. Your Honor, that is precisely what I was attempting to say. If I may take your question and state it affirmatively. That is the position I was attempting to say. It is beside the point. Yeah, but if it's beside the point, then maybe you lose. Because maybe if it's beside the point, we think, well, it really isn't part of his duties. No, Your Honor, that's not what I mean. I mean, you suggested that his duties and his expectations, his professional responsibilities, what he owes as a member of the State Police and as the incident commander, specific in general, and what is expected of him from the State Police, the field regulations tell us that, is a matter entirely separate from what Depp does or doesn't say. That's the position I have. I think we're dancing on the head of a pin here. The problem is, as has been hinted, particularly by Judge McKee's questions to my learned opponent, is, in fact, it is very unlikely that a police officer will be speaking within the parameters of First Amendment constitutional protection whenever he or she speaks as a police officer about matters like this. That is indeed the dilemma he's faced with. The law has, in fact, ended his cause of action. And he's attempting to refocus the matter in ways obviously beneficial to his client. That's his duty and that's his honor. But the fact is that he really has no solace left in the law. He doesn't because he's wrong to say there are no cases where this has been determined as a matter of law on the facts viewed in the light most favorable to the police officer plaintiff. Foraker v. Chaffinch is one such case, if indeed not others. And Skrutsky v. Merritt, which is a non-precedential opinion of your court written by Judge Cowen, is very, very close to this case about another officer talking about officers not directly under his command who he believes he has evidence committed misconduct in the course of their duties, which he brings up to his superiors. In Skrutsky, in Sigsworth v. The City of Aurora, which is a Seventh Circuit case which Judge Fischer relies on heavily, in Riley v. City of Atlantic City, we have cases where people make statements very much like that and none of them result in a determination that the police officer's statements are outside the scope of official duty. Are you saying that police speech would never be protected unless the officer goes to the newspapers or on television? It's very difficult for me to conceive of circumstances where it would be, especially in circumstances where this type of information is at issue. I'd like to make another point, too, and that is as far as this code of silence issue, I would suggest to you that that's a very adventitious theory as well. I believe that my learned opponent has waived it because if you look, the first time that that's ever raised, and we have a complete transcript of the argument that he and I had in front of Judge Fischer, which is part of the record in the case, as I'm sure you know, and if you look at the briefing there and the argument, if you look at Judge Fischer's opinion, this code of silence issue essentially arose at the reply brief stage, and I would suggest that's very late in the day. But more importantly, I don't believe there's any real evidence, because I don't think Depp's statement speaks for anything other than Depp's reaction to his remarks under the circumstances, and I don't believe there's any other evidence in the record, attractive as it might be as a plot for a novel or law and order, I don't believe there's really any evidence in the record that he was told by the state police to keep this quiet and not talk to anybody. Why wouldn't Depp's statement be enough? You've got a situation where you have a state trooper who's going to a supervisor, the state trooper who is speaking, Mr. Bronowski has some expertise in the use of force even beyond that which his peers and colleagues have, and he tells Depp that state police may have just gunned down an unarmed 14-year-old boy and he's told, mind your own business, why wouldn't that be enough to get a code of silence into the case? Because that's really not what he said. Not what Depp said you mean? Not what Bronowski said. Bronowski said, he says, he said, I'm not sure that the story that Nassan and Curry told is the way that it happened based on the location of the shell casings and some other facts that I learned as incident commander besides what I'm reading about in the newspapers after the coroner's inquest. I don't think it happened quite the way they said it happened. But why wouldn't an officer, and I'm referring to Depp. And he says, mind your own business. Why wouldn't his ears immediately go up and say, wait a minute, we need to talk about this. What are you telling me here? That's one reaction. The other reaction is, mind your own business. The mind your own business seems to me to be pretty clearly injecting the code of silence into the case. I understand what you're saying about it being formulated at perhaps a later date than it could have been. But it's sitting there and the case is pregnant with it. Some code of silence, I suggest, Your Honor, with all due respect. When you know that the man still has to be interviewed by the internal affairs officer. And in fact, that takes place three weeks later. I don't see that as a code of silence. I don't think the argument was made, for one thing. And there's certainly no other evidence that it can even be attempted to be shoehorned into support for it. I don't think, and in this I may respectfully beg to differ with you on that. But I don't think that the full circumstances of that whole exchange, looking carefully at what Baranowski says he said to Depp, and when he said it, and what Depp said back, constitutes anything like this code of silence argument. You see, what we haven't talked about here at all, but it really does underlie a significant portion of Garcetti, is its discussion of the fact that only in some cases is expression in the workplace protected. Because there are considerations of efficiency and all of those other items the case talked about. You cannot have, in my judgment, every time there's a disagreement between two employees, two public employees, that the disagreement becomes constitutionalized. And essentially, one can argue that that's what's happened here. Yes, Your Honor. That's what is alleged to have happened here. I was thinking along the lines that you were considering last night. And what I thought of was, what is the rationale for Garcetti? Because we, as Americans in law, can't respect something that's without a rationale, without a purpose. And I came up with something that is, in fact, what you've just stated. I think what they're trying to do was carve out an area in which the government, regardless of the point that it's the government, so everything it does is a matter of public concern, that the government has some ability to deal with its employees as simple employees. To function. Yes. To function. Yes. And that's what it's done. And it went back to Pickering and it said, wait, everything that happens in the workplace between an employee and an employer doesn't become a federal case because it happens to be a government employee and a government employer. Especially when it deals with matters within that government employees. Pickering had already handled that by one of the prongs of its test, a matter of public concern, speaking as a citizen, not as an employee. That already got to the kind of grievance disputes that you don't want to have rise into a constitutional court under 1983. I respectfully suggest, Your Honor, not to the full satisfaction of the current bench of the United States Supreme Court. Well, clearly that's true. That is clearly true. That's the point. I mean, and the difficulty is all of us trying to reorient ourselves when, in fact, Garcetti worked the sea change. And there is an irony here, which Judge Greenberg's questions earlier pointed out, and that is the more important the government employee, the more serious his or her job, then the less likely there is to have constitutional protection. If it's somebody who's a nuclear arms scientist and she's the key brain on whether or not there are weapons of mass destruction in a particular Middle Eastern country, and she comes to her employer and says, you know, I really think they are there or I really think they are not there, there can't be a matter today of more public concern to us, but that's part of her official duties. That's precisely what she's there to talk about. And if the employer says, well, you know, I don't like your attitude, you're not patriotic, or you're a warmonger, or you're somebody who's allowing your pacifistic tendencies to determine your analysis, Garcetti means that there is no constitutional protection. More to the point, the example I kept coming back to was the safety engineer at a nuclear power plant who blows the whistle, if you will, and says, you know, the shutdown, the software that controls the shutdown mechanism on the fuel rods is malfunctioning. If we get an event here, we can't cool it down. And the supervisor looks at it and says, do you have any idea how much it's going to cost us to retool those fuel rods and to rewrite that software now, forget about it, not in the South Philly forget about it sense, but just go away, ignore it, and the person's fired for opening up. And that's really a matter of public concern. If you get a nuclear plant melting down, probably more realistic. And there's no First Amendment protection there. His or her protection is to go public. To file a whistleblower suit. Or to file a whistleblower suit. And in fact, in all fairness to the current Supreme Court of the United States, they are in fact Federalists, and they say this is a vital, vibrant area for state lawmaking. And Pennsylvania is such a state. In Judge McKee's example, if he goes public, that's not part of his duty. What he does is go on a television show. So that's not part of it. Judge, I've lost your, I can't hear you. Oh, if he or she, the nuclear engineer goes public, can you hear me now, sir? Yes, I can, Your Honor. Okay. Goes public and says on television, this is the situation. Now that's not part of the person's duties. So in that case, if they fire him or her for doing it, then it's not a First Amendment situation, right? No, Your Honor. I would, I may, and frequently I'm wrong about many things. Then it would be. Then it would be a First Amendment situation. It would be. Okay, but the problem is that maybe the fact that he or she went public, although it might seem like a First Amendment situation, is so counter to the interest of the government because the last thing we want is for everybody around to know this is true. But would they still have a First Amendment right? In other words, it's important. What happens then is a balancing act. I think they have a First Amendment right. They have a right to exercise their right. They may not have a right to be a nuclear engineer, to go back to Oliver Wendell Holmes' old dictum, which this whole area arises out of. He said a policeman has a right to have, in those days they were men. So a policeman has a right to have an opinion about whether to be a Republican or a Democrat, but he doesn't have a right to be a policeman. But take a less esoteric situation where a policeman gets on television and says, my God, they've got all these banks in this town and the safes don't even get locked at night, and I can't do anything about it. So, all right, he now has a First Amendment right. He's not hired and he's done grievous harm. Does the First Amendment protect that? I don't think the First Amendment is designed to care whether or not the government is happy with the speech or whether or not the speech is something that enjoys a majority support among our population or whether or not it's speech that people find repugnant. I think the First Amendment is largely designed to protect us from speech we don't like to hear, and that may in fact be speech we don't like to hear. The context of the public employment situation that makes it so difficult is that you can't have it both ways. You can't speak to your superiors, incidentally, who've invited you to speak to them, only at work. Tell everyone, while virtually saluting, that you would never speak to anyone beneath your level of rank about this subject. You're an absolutionist. You take an absolute position. After all, the First Amendment does say Congress shall make no law bridging the right of speech. Where all these nuances come in might seem like a mystery to people, how all these distinctions are drawn out of that language. But I think it was Justice Black said, that's what it meant. You just couldn't restrict it. That's what it says. I think that's the point. And what Garcetti says, though, is that the circumstances under which you find yourself making the statement may at times mean that it is not free speech because of the relationship that you've gotten yourself into. You're a public employee speaking within your public employment about something that practically has to do with public employment. It's a quid pro quo. Yes. Who's the real party in interest here? Because these are the, who are the appellees here in this case? I mean, is it the state is going to have to pay, or what happens here? Well, under Section 1983, the defendants are individuals. Well, I know that they can be liable, but is there indemnification? Yes. Frankly, I couldn't help but wonder that when I read about the underlying suit, how the plaintiffs were going to collect $20 million or whatever. Well, we've since composed. You've settled it. We've settled that, yes, Your Honor. It's a very good question. But the fact is, under the Commonwealth Attorneys Act, the Office of General Counsel has determined that these individuals are entitled to liability indemnification by the Commonwealth of Pennsylvania. Of course, that really doesn't affect our determination. No. That's a matter between them and the troopers and the Commonwealth. Yes, Your Honor. Yes, Your Honor. I think he did. Mr. Richley, thank you very much. Thank you. Mr. Bryan, we're going to hold the reins a little tighter on the rebuttal. Okay, that's very good. When the light turns red. Very quickly, Your Honor, opposing counsel, my learned opponent, argued vigorously that this was incident to Mr. Baranowski's duties as the incident commander. I would ask the court to identify one piece of evidence that supports that conclusion. Where is the testimony from anyone that says that what he said to Depp or to Waters was part of his duties as the incident commander? They have thrown that out there. There's not a single fact that supports it. Baranowski didn't say it. Depp didn't say it. Waters didn't say it. The expert witness didn't say it. Secondly, Garcetti is not as broad as what Mr. Marickley just argued that it was. If it was, why would Garcetti have gone through all of those contortions talking about the fact that it was part of his duties as the calendar control attorney? Why wouldn't they just simply say, hey, you're a district attorney, and you have a responsibility to make sure that people tell the truth. That's part of your duties. The court didn't do that. And the reason the court didn't do that is because they wouldn't want absurd results as the one that Mr. Marickley just argued for. According to him, no police officer in the Commonwealth of Pennsylvania employed by the Pennsylvania State Police has any First Amendment rights. In speaking to a supervisor, that doesn't mean the situation would be the same if they go to a state representative or a TV interview. It may be really drastic, unintended consequences arise from it. No, no. Ober v. Ivanko says they can't go outside the state police, that they have no constitutional right to go out. That's this court's decision. So Mr. Baranowski was doing what he could as a citizen because if he went outside of the state police, he wouldn't have any protections. But here's the point. There are facts in this case that contradict the conclusion that this was part of his duties. How do we ignore those facts? Nothing in Garcetti says you have to ignore facts. Garcetti says make a practical inquiry. Well, what does that mean? Practical inquiry into scope of employment duties is fact intensive. Well, what do you look at? Did they expect him to actually report about this? Evidence would indicate they didn't. I don't think you can just throw Garcetti out there and say, you know, Garcetti, Garcetti, Garcetti, we don't have to look at the facts. You do. In fact, this court has said so. You said so in Deluzio and you said so in Riley. It does matter what the supervisor says. It does matter if the supervisor says, I don't think that's part of your duties. Also, they continue to bring up this homicide report. I would invite you to read what Mr. Baranowski wrote. We're simply too. And this is you can find this at record. You realize I just give us the site for it. Yes, Your Honor. I'm looking for it right now. For some reason, the page does not appear here. I will submit that to the court in a post submission. But if you look at the what Mr. Baranowski wrote, it's simply that he secured the scene. If you look with Lieutenant Job said that's all he was supposed to do. And if you look at the. We'll take a look at that. If you could. For a day with that site, that would be helpful. I will do that. Thank you. Both Mr. O'Brien and Mr. Hersey for a very finely argued case. Gentlemen, it's a very difficult case. And your argument, at least I find it very helpful. I'm sure my colleagues did, too. In a case of this magnitude and of this complexity, that kind of advocacy with both of you presented today is really helpful. And I appreciate it very much. I'm sure my colleagues do, too. It was also very gracious. They each called the other learned. Yeah, it was. Then I said it three times. Plus, he said we were able. Thank you. Thank you. Bye bye. Bye.